ROSEMARY LEDET, Judge.
|! This is a commercial lease dispute involving damages to the leased premises. The plaintiffs, Kenneth M. Sigur and Frederick J. Sigur, Jr., as testamentary co-executors of the Succession of Frederick J. Sigur (the “Lessor”), are the owners of a two-story building located at 8717-21 West Judge Perez Drive in Chalmette, Louisiana (the “Premises”).[1] The defendants, Donald A. Ditta and Donald Henrit-zy, Jr., doing business as Fitness 2000, (collectively the “Lessees”), leased the Premises from April 1,1997 to January 30, 2000. After the Lessees vacated the Premises, the Lessor sued them for the damages they allegedly caused to the Premises and attorneys’ fees. Following a bench trial solely against Mr. Ditta,[2] the *532 trial court awarded the Lessor a total of $23,318.52 in damages, which | ^included an award of $2,119.86 in attorneys’ fees. From this judgment, Mr. Ditta appeals. For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
On April 1, 1997, the Lessor and the Lessees entered into a lease of the Premises for use as a health and fitness center (“Lease 1”). Lease 1 was for an eighteen month term, ending on September 30, 1998, and covered two of the three portions of the building. On October 1, 1998, the parties entered into a second lease for a one year term, ending on September 30, 1999, that covered the same two portions of the building (“Lease 2”). During the term of Lease 2, the parties entered into a third lease to expand the area of the building that the lease covered to include the third portion of the building (“Lease 3”). Lease 3 ended on the same date as Lease 2, September 30,1999.
In anticipation of the leases expiring, the parties engaged in discussions regarding renewing the lease. Although the leases included an option to renew, the leases also included a rent escalation clause— Lease 2 provided for a $300 per month rent increase;' Lease 3 provided for a $100 per month rent increase. At that time, the Lessees indicated they were unable to afford an increase in rent; thus, they requested additional time at the same monthly rental. The Lessor agreed to allow them an additional four months— until February 1, 2000 — at the same rental and under the same lease terms. Although the Lessor prepared a new lease that was to take effect on February 1, 2000, it was never executed. Instead, on Sunday, January 30, 2000, the Lessees vacated the premises, moving to a new location |sacross the street. The Lessees paid all of the rent that was due through January 30, 2000.
On Monday, January 31, 2000, the day after the Lessees vacated the Premises, the Lessor’s representative, Frederick J. Sigur, Jr.,[3] inspected the building. According to Mr. Sigur, he found the Premises in a state of disarray and in a damaged condition. He also found that the Lessees had taken some of the Lessor’s exercise equipment. A few weeks after the Lessees vacated the Premises, Mr. Sigur took a series of thirty-five photographs (the “Photographs”). According to Mr. Sigur, the Photographs reflected the damaged condition in which he found the Premises on January 31, 2000.
On December 29, 2000, the Lessor commenced this suit against the Lessees. In its petition, the Lessor averred that the parties reached an agreement for the Lessees “to continue the lease of said premises under the same terms and conditions as contained in said lease with modifications to rental amount pending completion of an executed written lease agreement.” The Lessor further averred that on January 30, 2000, the Lessees vacated the premises “without notice and after causing serious damage to the leased premises.” The Les *533 sor enumerated the damage to the leased premises as consisting of the following:
a. Destruction of interior walls and partitions on both levels of the leased premises;
b. Removal and destruction of doors located within the leased premises;
|4c. Destruction and removal of various plumbing fixtures throughout the premises;
d. Removal and destruction of door framing and trim within the leased premises;
e. Breakage of exterior glass windows;
f. Removal of stair railing within the leased premises;
g. Removal of walls and partitions without replacement thereof;
h. Failing to complete remodeling work begun;
i. Removal of ceiling and mechanical air handling equipment without repair and replacement thereof;
j. Rewiring portions of the leased premises in violation of parish and state electrical codes without proper procedures being followed, and the failure to return electrical system to a safe condition;
k. Removal of plumbing systems without proper reconnections being provided;
l. Leaving the premises in disarray and with trash and debris located throughout;
m. Removal of exercise equipment owned by Lessor without permission and failure to return same;
n. Other acts of damage to be shown at the trial hereof.
The Lessor averred that the net cost to repair the damages to the premises and to replace the exercise equipment taken by the Lessees was $21,198.66. This figure was the total amount of damages after deducting the $1,500.00 damage deposit that the Lessor alleged the Lessees forfeited. The Lessor also averred that it was due reasonable attorneys’ fees of ten percent as provided in the leases, court costs, and judicial interest from the date of judicial demand.
On February 9, 2001, the Lessees filed a joint answer generally denying the allegations of the petition and further answering:
|F* Defendants did not agree to extend the lease of said premises, but instead notified plaintiff that if there was an increase in the rent for the premises, then defendants would vacate said premises.
• When defendants initially leased the premises, it was unsuitable for use as a health club due to the fact that it was formerly a nightclub. Due to the fact that the walls and ceiling had been painted black, light fixtures had been removed, and extensive damage done the premises by the former occupants, defendants were made to expend substantial funds repairing the premises and making it suitable for the health club.
• Defendants aver that any damage to the subject premises was done by unknown parties after defendants vacated the premises, as defendants left said premises in perfect order and in superior condition.
In July 2001, the depositions of both defendants were noticed; on July 24, 2001, Mr. Ditta was deposed. Thereafter, the record reflects no activity in the case until January 1, 2005, when the Lessor filed a motion to set the matter for trial.[4] At *534 defense counsel’s request, the trial was continued to September 25, 2005. Due to the devastation to St. Bernard Parish caused by Hurricane Katrina, which struck the area on August 29, 2005, the trial date was continued.
In January 2008, the Lessor filed a motion to set the matter for trial. On March 24, 2008, a trial scheduling and case management order was issued setting the trial for December 9, 2008. Defense counsel signed this order. On November 18, 2008, defense counsel filed a motion to continue the trial. In that motion, defense counsel indicated that he was unable to locate his client, Mr. Ditta, and that his other client, Mr. Henritzy, had filed for bankruptcy. On November 24, 2008, another trial scheduling and case management order was issued setting the trial for April 2, 2009. Defense counsel signed this order. On March 18, 2009, defense counsel filed a motion to withdraw as counsel of record. In this motion, defense | ficounsel again noted that he was unable to locate Mr. Ditta and that Mr. Henritzy had filed for bankruptcy.
On April 2, 2009, defense counsel’s motion to withdraw was granted. On that same date, a trial was held at which Mr. Ditta was absent and unrepresented. Following the trial, judgment was rendered in favor of the Lessor and against Mr. Ditta for the full amount of damages prayed for in the petition, $21,198.66, plus ten percent attorneys’ fees. On July 14, 2010, the trial court granted Mr. Ditta’s motion for new trial. On August 16, 2011, a status conference was held at which the matter was set for trial on November 14, 2011.
On October 12, 2011, Mr. Ditta filed a motion to dismiss the suit as abandoned. He contended that there was three years of inactivity and no formal step on the record in the case between the date of his deposition, July 24, 2001, and July 25, 2004. He thus contended that under La. C.C.P. art. 561 the case was abandoned as of July 25, 2004. On October 13, 2011, the trial court signed an ex parte order of abandonment. In response, the Lessor filed a motion to have the order vacated and the case reinstated. Granting that motion, the trial court, on October 26, 2011, vacated its order of abandonment. On February 12, 2012, this court denied Mr. Ditta’s application for emergency supervisory writ, stating that “[o]n the showing made, we decline to exercise our supervisory jurisdiction.” Succession of Sigur v. Henritzy, 12-0177 (La.App. 4 Cir. 2/12/12) (unpub.).
On February 23, 2012, a bench trial was held in this matter. The Lessor called the following six witnesses: (1) Gabriel Wood, who did the cleanup work; (2) Eugene Dow, the owner of Gene & Son Renovations; (3) Mr. Sigur; (4) Patrick Farley, the owner of Dependable Electric, Inc.; (5) Charles Comeaux, the owner of 17Comeaux Refrigeration <& AC;[5] and (6) Rene Dau-terive, Jr., the owner of Dauterive Plumbing and Heating, Inc. The Lessor introduced in globo the Photographs taken by Mr. Sigur; Mr. Sigur testified the Photographs reflected the condition of the Premise on the day after the Lessees moved out. The Lessor also introduced copies of the pertinent lease agreements, repair invoices, and repair estimates. Mr. Ditta called the following three witnesses: Edward Estopinal, IIII; Earl Bush; and himself.
Following the trial, the trial court allowed the parties to file post-trial memo-randa. In its post-trial memorandum, the Lessor enumerated the damages it sustained as a result of the disarrayed and *535 damaged condition in which the Lessees left the Property in the following chart:
[ITEM OF DAMAGE] [AMOUNT]
1. Repair of front door glass (Guidry Glass) $52.66
2. Cost of labor to clean up trash and debris (E.McDonald, G.Wood) $213.00
3. Repair and replacement for upstairs and downstairs damage (Gene & Sons Renovation) $13,275.00
4. Repairs to bring back electrical systems to original condition (Dependable Electric, Inc.) $7,200.00
5. Repair electrical service and meters to bring back to original condition (Dependable Electric, Inc.) $870.00
6. Repair to air conditioning duct work (Comeaux Refrigeration/Air Conditioning) $500.00
7. Replace value of used equipment used by tenant and either left broken or taken by tenant (owned by Lessor) $588.00
Total damages suffered by Plaintiff $22,698.66
Forfeiture of Damage Deposit (Credit) ($1,500.00)
Net Damages $21,198.66
Attorneys’ fees 10% $2.119.86
Total damages recoverable by Lessor $23,318.52
|sOn May 24, 2012, the trial court rendered judgment in the Lessor’s favor and against Mr. Ditta for $23,318.52. The trial court’s award corresponded with the “Total damages recoverable by Lessor” — the bottom line figure in the Lessor’s chart quoted above (the “Lessor’s Chart”). This appeal followed.
DISCUSSION
Although Mr. Ditta fails to specify any assignments of error, the Lessor correctly points out that Mr. Ditta essentially raises two issues on appeal: (i) whether the trial court erred in finding the case was not abandoned; and (ii) whether the trial court erred in finding the Lessees damaged the Premises and awarding damages. As to the second issue, Mr. Ditta argues that even if he is liable for the damages, the Lessors’ failure to make some of the repairs negated any liability on his part. We separately address each issue.

(i) Abandonment

Whether a particular act, if proven, precludes abandonment is a question of law, which we review by determining whether the trial court’s interpretative decision is correct. Olavarrieta v. St. Pierre, 04-1566, p. 3 (La.App. 4 Cir. 5/11/05), 902 So.2d 566, 568; Escoffier v. City of New Orleans, 06-1005, p. 2 (La.App. 4 Cir. 4/11/07), 957 So.2d 216, 218; True Gospel of Jesus Christ Church Ministry v. Doucette, 08-0634, p. 4 (La.App. 4 Cir. 11/19/08), 999 So.2d 795, 797-98. To make this determination requires that we conduct a de novo review. See Ursin ex rel. Eusan v. Board of Levee Com’rs of Orleans Levee Dist. of State, 11-1105, p. 5 (La.App. 4 Cir. 9/26/12), 104 So.3d 534, 538 (citing Broussard v. Hilcorp Energy Co., 09-0449, 09-0469, p. 3 (La.10/20/09), 24 So.3d 813, 816).
The controlling statutory provision is La. C.C.P. art. 561, which provides that “[a]n action is abandoned when the parties fail to take any step in its 19prosecution or defense in the trial court for a period of three years.” La. C.C.P. art. 561 A(l).[6] *536 The Louisiana Supreme Court has uniformly held that Article 561 must be liberally construed in favor of maintaining a plaintiffs suit. Louisiana Dep’t of Transp. and Development v. Oilfield Heavy Haulers, L.L.C., 11-0912, p. 5 (La.12/6/11), 79 So.3d 978, 981-82 (citing Clark v. State Farm Mut. Auto. Ins. Co., 00-3010, p. 8 (La.5/15/01), 785 So.2d 779, 785). “Because dismissal is the harshest of remedies, any reasonable doubt about abandonment should be resolved in favor of allowing the prosecution of the claim and against dismissal for abandonment.” Oilfield Heavy Haulers, supra (citing Clark, 00-3010 at p. 10, 785 So.2d at 787).
Article 561 imposes three legal requirements: (1) a party must take some step toward the prosecution or defense of the lawsuit; (2) the step must be taken in the trial court and, with the exception of formal discovery, must appear on the record; and (3) the step must be taken within the legislatively-prescribed time period from the last step taken by either party. James v. Formosa Plastics Corp. of Louisiana, 01-2056, p. 4 (La.4/3/02), 813 So.2d 335, 338. A party takes a “step” 110when it takes formal action before the trial court intended to hasten the matter to judgment. Id.
In Clark, supra, the Supreme Court explained that there are two jurisprudential exceptions to the abandonment rule. Those two exceptions are as follows:
(1) a plaintiff-oriented exception based on contra non valentem, that applies when failure to prosecute is caused by circumstances beyond the plaintiffs control; and
(2) a defense-oriented exception based on acknowledgment, that applies when the defendant waives his right to assert abandonment by taking actions inconsistent with an intent to treat the case as abandoned.
Clark, 00-3010 at p. 7, 785 So.2d at 784-85.
The second exception is based on the principle that a defendant’s post-abandonment actions — unlike a plaintiffs post-abandonment actions — can serve to waive his right to plead abandonment. 1 Frank L. Maraist and Harry T. Lemmon, LOUISIANA CIVIL LAW TREATISE: CIVIL PROCEDURE § 10.4 (1999) (citing Middleton v. Middleton, 526 So.2d 859 (La.App. 2d Cir.1988)). In Clark, supra, the Supreme Court cited several examples of conduct which could amount to a waiver of abandonment, including making an unconditional tender, “agreeing to a trial setting, submitting a case for decision, seeking security for costs, or provoking or responding to discovery.” Clark, 00-3010 at p. 14, 785 So.2d at 789, n. 15.
In this case, Mr. Ditta argues that the trial court correctly granted his motion to dismiss as abandoned and that this court is required to reinstate the dismissal of this case as abandoned as of July 25, 2004. In *537 support, he cites the three years of inactivity between the date of his deposition, July 24, 2001, and the date of the |nLessor’s filing a motion to set for trial, January 12, 2005. He contends that, under La. C.C.P. art. 561, the action was abandoned as of July 25, 2004.[7]
The Lessor counters that the defense-oriented exception applies. In support, the Lessor provides the following enumeration of actions (or steps) in the prosecution or defense of the suit that were taken by Mr. Ditta:
• February 23, 2005 Trial Scheduling and Case Management Order wherein the trial was set for July 28, 2005 participated in by counsel for Appellant.
• July 14, 2005 Motion to Continue Trial filed by counsel for Appellant, Donald A. Ditta, and wherein a Notice of Continuance was rendered on July 18, 2005 resetting the matter until September 12, 2005.
• March 24, 2008 Pretrial Scheduling and Case Management Order participated in by defense counsel for Donald A. Ditta.
• June 2, 2008 letter request for settlement demand sent by counsel for Appellant to counsel for Appellee.
• November 18, 2008 Motion to Continue Trial filed by counsel for Appellant, Donald A. Ditta set and heard on November 24, 2008 and resulting in Trial Scheduling and Case Management Order wherein trial was set for April 2, 2009, which was participated by counsel for Donald A. Ditta.
• April 12, 2010 Motion for New Trial filed by counsel on behalf of Defendant, Donald A. Ditta, wherein a rule was set to be heard on May 21, 2010.
• Counsel for Appellant, Donald A. Dit-ta, participates in and argues Motion for New Trial on June 10, 2010, resulting in motion being granted.
• August 16, 2011 counsel for Appellant participates in Status Conference set for such day and counsel for Appellant accepting service on behalf of Appellant resetting matter for trial on November 14, 2011.
Based on the above steps or actions by Mr. Ditta, the Lessor contends that Mr. Ditta waived his right to have the suit dismissed as abandoned. We agree. The record reflects that Mr. Ditta took multiple actions inconsistent with an intent toj^gtreat the case as abandoned after the abandonment period accrued. Mr. Ditta’s contention that the trial court erred in finding the case was not abandoned is unpersuasive.

(ii) Damages to Premises

Before reaching the issue of damages, we first address a threshold issue of whether this case is governed by a lease agreement. At the time the Premises were vacated, the leases between the parties had expired; Lease 2 and Lease 3 both expired on September 30, 1999. The trial court, in its reasons for judgment, stated that “[t]he parties continued the rental arrangement pending further negotiation on a new lease reconducting the former lease on a month to month basis.” The parties do not contest this statement.
Reconduction occurs “ ‘when a fixed-term lease expires and the lessee without opposition continues to occupy the premises for more than a week.’ ” Southern Ventures Corp. v. Texaco, Inc., 372 *538 So.2d 1228, 1230 (La.1979) (quoting Governor Claiborne Apartments, Inc. v. Attaldo, 256 La. 218, 235 So.2d 574 (1970)). When reconduction occurs, “ ‘[t]he reconducted lease is actually a continuation of the lease under the same terms and conditions except that the fixed term or period of duration in the old lease is voided and the reconducted lease is considered to be by the month.’ ” Id.
Lease 2 and Lease 3 both included a non-reconduction provision, which stated that “should lessor allow or permit lessee to remain in the leased premises after the expiration or termination of this lease, this shall not be construed as a reconduction of this lease.” Despite the non-reconduction provision in the leases, Mr. Sigur testified that the parties agreed that the Lessees would be allowed to remain on the Premises under the same terms, including the same rental amount, |1sfor an additional four months. Given the parties agreed on a month-to-month continuation of the prior leases, either there was an express recon-duction of Lease 2 and Lease 3 — overriding the non-reconduction provision of the leases — or a new agreement to be bound by the terms and conditions of the leases for an additional four months. See Misse v. Dronet, 493 So.2d 271, 274 (La.App. 3d Cir.1986) (noting that “[w]hether this month-to-month continuation of the prior agreement is viewed as a reconduction or, alternatively, as a separate, new agreement for the month-to-month rental of the premises, the result is the same.”) We thus find the terms of the two written leases in effect at the time of the reconduction govern this dispute.
Given our finding that the leases control, we note that the leases contain the following four provisions pertinent to this dispute:
Condition and Maintenance: The within leased premises and appurtenances ... are accepted by the Lessee in their present condition.... The Lessee agrees to keep them in the same order as received, during the term of the lease ... and at the termination or cancellation of this lease to return the premises broom clean and free from trash, and in like good order as received ... the usual decay, wear and tear excepted. (Lease 2 and Lease 3).
Improvements: Lessee is obligated not to make any additions or alterations whatever to the premises without written permission. All additions, alterations or improvements made by Lessee with or without consent of Lessor, no matter how attached (except movable trade fixtures), must remain the property of Lessor, unless otherwise stipulated herein, Lessee, however, expressly waiving all right to compensation therefor. The Lessor, at his option, may require the building to be replaced in its original condition. (Lease 2 and Lease 3).
Non-payment of Rent, Etc.: Should an Agent or Attorney be employed to give special attention to the enforcement or protection of any claim of Lessor arising from this lease, Lessee shall pay, as fees and compensation to such Agent or Attorney an additional sum of ten per cent of the amount of such claim, the minimum fee, however, to be $25.00, or if the claim be not for money, then such sum as will | ¶4constitute a reasonable fee, together with all costs, charges and expenses. (Lease 2 and Lease 3).
[Damage/Security Deposit:] A deposit of $1,500.00 is to be placed as security on this lease. Said deposit is refundable to Lessee upon vacating the premises providing all rents have been paid up to date, the premises has been left clean and undamaged, and providing all other *539 terms of this lease have been adhered to. (Lease 2).
As the trial court pointed out, the issue presented at trial was whether the Lessees left the Premises in a damaged condition in contravention of the terms of the recon-ducted leases. Answering this question in the affirmative, the trial court provided the following reasons for judgment:
Plaintiffs representative, Frederick J. Sigur, Jr., entered the formerly leased property for the purpose of making an inspection of the vacated property, surveyed the damage and disarray caused during the term of the Defendant’s occupancy, and replaced or repaired the damage at a net cost of ... $21,198.66 ... in accordance with the testimony and corroborated by the invoices and exhibits introduced as evidence at trial....
As a defense to the action for leasehold damages, the defense presents a factual scenario asserting that the tenants were required to make significant repairs and alterations to the property prior to the commencement of the lease term, in order to make the property suitable for use as a health club in return for a reduced rent during the lease term. Defendant describes this arrangement as an ordinary lease practice of Petitioner. However, the clear and precise lease terms make no reference to such arrangement. The lessees take possession of the leased property in its condition at the time of the lease absent any specific provision to the contrary. The lease provides the tenant may make repairs or improvements to the structure with the consent of the owner and that all improvements become the property of the owner without payment for such improvements, or the owner may permit the tenant to remove them and restore the building to its condition at the commencement of the lease. The lease clearly sets forth the monthly rent without provision for reduction or credit thereon for any reason....
Perhaps, Defendant, Donald Ditta, anticipated a lower monthly rental rate on the new lease or at least avoid a possible rent increase in the potential new lease agreement that he was in the process of negotiating in January 2000. However, the failure of his expectation of a future lower rent cannot re-write the terms of the lease which |, ^obligated him to deliver the leased property undamaged or in need of repair....
Defendant’s scenario begins with a bold and unproven statement that the property was used only as a night club and that the structure “should have been condemned for not being fit for purpose of human habitation and or consumption.” Notwithstanding, Defendants rented, occupied and conducted business therefrom for over a year, leaving only to a lower rent “across the street.” Thereafter, he paints a picture of the leased property being left in a much more improved condition at the time Defendants vacated the property in January 2000, than it was at the initiation of the lease in October 1, 1998, due to repairs and improvement made as lessee, all to the benefit inuring to Petitioner in enhanced value of the property. He further proposes belief, after his broom clean exit, the property was vandalized by some parties, unknown to them, but “emanating from the apartment complex (which was plagued with vandalism) immediately behind Mr. Si-gur’s property which was not dismantled until post Katrina event.” ...
The only evidence Defendant produced was the testimony of Edward Es-topinal and Earl Bush, an active fireman and a retired fireman of St. Bernard *540 Fire Department, respectively.... Both witnesses were customers of the health club operated by Defendant, who stated they assisted Defendant in moving and vacating the leased property which was left in good condition. Mr. Estopinal cannot recall the year of facts he testified to, yet both appear to have been rehearsed in then* suggestive recollection of the events from their testimony, the form of substance of the testimony, their demeanor on the witness stand and in the manner of them responses' — disproportionately causes them testimony to be highly improbable and contrived.
[[Image here]]
Plaintiff [Mr. Sigur] testified he examined the property very shortly after the defendants vacated it. Thereupon, his testimony reveals that he examined the damage to the property and confirmed the damage. Photographs were introduced in evidence taken by the Plaintiff at that time showing the damaged portions of the rental property. This positive evidence cannot be overcome by a conjured argument having no basis to the reality and absent from the record. The plaintiff is under no obligation to immediately perform the repairs caused by the damage to the property during the defendant’s occupancy.... Any postponement of the repairs ... may not operate to excuse damage caused by the Defendant.
| mFor the above reasons, the trial court awarded the Lessor a lump sum damage award in the amount of $23,318.52. As noted, this award corresponds with the bottom line figure in the Lessor’s Chart. Implicit in the trial court’s award of this exact damage figure is a finding that the Lessor established its right to recover each of the seven categories of damages set forth in the Lessor’s Chart.
When, as in this case, a lessor claims that the lessee is liable for damages to the leased premises, “the burden of proof is upon the lessor to prove the loss, and special damages must be proved to a reasonable certainty.” Moreau v. Griffith, 96-683, p. 4 (La.App. 3 Cir. 12/11/96), 685 So.2d 563, 565 (citing former La. C.C. art. 2721 (which provided that “[t]he lessee is only liable for the injuries and losses sustained through his own fault”) and Guidry v. Midgett, 488 So.2d 1323 (La.App. 3d Cir.1986)).
The trial court’s award in this case consists solely of special damages. See Wainwwright v. Fontenot, 00-0492, p. 5 (La.10/17/00), 774 So.2d 70, 74 (noting that “[sjpecial damages are those which either must be specially pled or have a ‘ready market value,’ i.e. the amount of damages supposedly can be determined with relative certainty.”) The Louisiana Supreme Court set forth the standard of review for special damages in Kaiser v. Hardin, 06-2092, pp. 11-12 (La.4/11/07), 953 So.2d 802, 810, as follows:
In reviewing a jury’s factual conclusions with regard to special damages, an appellate court must satisfy a two-step process based on the record as a whole: There must be no reasonable factual basis for the trial court’s conclusions, and the finding must be clearly wrong. Guillory v. Ins. Co. v. North America, 96-1084 (La.4/8/97), 692 So.2d 1029.
Id.; see also Moffitt v. Sewerage & Water Board of New Orleans, 09-1596, pp. 17-18 (La.App. 4 Cir. 5/19/10), 40 So.3d 336, 346; Coxe Property Management and Leasing v. Woods, 09-1729, pp. 3-4 (La.App. 4 Cir. 8/11/10), 46 So.3d 258, 260.
Utilizing the seven categories of damages set forth in the Lessor’s Chart, we briefly summarize the Lessor’s evidence supporting each of the items of special damages that the trial court awarded.

*541
Repair of front door glass

Mr. Sigur identified an invoice for $52.66 from Guidry Glass, which he paid, to replace a broken window in the front door of the Premises. Mr. Sigur also identified one of the Photographs that depicted the broken glass.

Cost of labor to clean up trash and debris

Mr. Wood testified that he and Eddie McDonald performed cleanup work for Mr. Sigur in 2000 at the building formerly occupied by Fitness 2000. He further testified that the cleanup work they performed at the Premises included hauling off trash — mostly sheetrock, ceiling tiles, and some wood — and anything else left behind by the Lessees. He still further testified that Mr. Sigur paid him $105 for the cleanup work. He confirmed that the Photographs reflected the condition of the Premises at the time he performed the cleanup work. Mr. Sigur testified that he paid both Mr. Wood and Mr. McDonald to perform the cleanup work. He identified his handwritten receipt indicating that he paid Mr. Wood $105 and Mr. McDonald $108, or a total of $213, for the cleanup work.

Repair and replacement for upstairs and downstairs damage

Mr. Dow (owner of Gene & Son Renovations) testified that he had been in the renovating business for eighteen years. At Mr. Sigur’s request, Mr. Dow prepared a repair estimate for the Premises. In his estimate dated February 28, |1S2000, Mr. Dow outlined the work to be performed to repair the Premises as follows:
DOWNSTAIRS:
Tear out damaged tanning rooms and counter.
Replace broken toilet in single bathroom.
Repair water cooler supply and drain lines.
Remove and haul all debris and leave area broom clean.
UPSTAIRS:
Replace all walls removed by tenant on the east side of the building to their original location.
Replace all suspended ceilings that were removed by tenant.
All replaced walls will be sheetrocked, taped, floated, textured and painted.
Replace two toilets, two wash basins and one urinal removed by tenant in the two bathrooms on the west side of the building.
Remove and haul all debris and leave area broom clean.
NOTE: This estimate includes no electrical work and no air conditioning work.
Mr. Dow testified that he prepared the repair estimate but did not perform any of the repairs. Mr. Dow confirmed that the Photographs depicted the condition of the Premises he observed when he went there to prepare his estimate.
Mr. Sigur testified that when the Lessees moved out, they were in the process of renovating the upstairs of the Premises and left it “[h]alf undone.” Mr. Sigur identified an invoice dated October 15, 2002 from Home Depot for ceiling tiles that he purchased. He explained that he purchased the ceiling tiles to replace the ones that were torn out, which was primarily in the same area where the air conditioning duct work was torn out. Mr. Sigur further testified that “downstairs where they had tanning beds, they tore the tanning rooms apart and left all the debris, as you see from the photographs, all over the place to get the tanning beds out of the rooms. For some reason, they had to tear *542 the back walls out of the tanning rooms to get the beds out.”
|19Mr. Dauterive (owner of Dauterive Plumbing and Heating, Inc.) testified that he was a master plumber. He further testified that he performed repairs at the Premises for Mr. Sigur and identified his two invoices, both dated October 24, 2000, that totaled $3,524.36 in repairs. Mr. Dau-terive explained that one invoice was for repairs to the upstairs, which included replacing two toilets and two laboratories, repairing two floor drains, and installing a drinking cup. Mr. Dauterive’s invoice for the downstairs indicated that the work he performed there included replacing a water closet in the restroom. Mr. Sigur explained that the plumbing repairs on Mr. Dauterive’s invoices were included in Mr. Dow’s estimate.
Repairs to bring back electrical systems to original condition, and repair electrical service and meters to bring back to original condition[8]
Mr. Farley (owner of Dependable Electric, Inc.) testified that he was a licensed electrician. He further testified that Mr. Sigur would call him when tenants moved in and out to do the necessary work or repairs. Mr. Farley confirmed that the Photographs depicted the condition of the Premises after the Lessees moved out. Mr. Farley denied ever seeing the Premises in that condition before then. Mr. Farley identified the estimates he prepared, at Mr. Sigur’s request, to bring the Premises “up to code and back to original.” He explained that the electrical system was deficient. Mr. Farley testified that he performed some of the work reflected on his estimates, but he evaluated the other work. On cross-examination, Mr. Farley was questioned whether the Lessees’ action of combining all three services into one meter was consistent with their use of the property given |2othey occupied all three separate portions of the building. He replied that the manner in which they did so was “not up to Code.” He further replied that to repair the meters was “not easy” and required labor time.

Repair to air conditioning duct work

Mr. Comeaux (owner of Comeaux Refrigeration & AC) testified that Mr. Si-gur requested him to provide an estimate to repair the air condition duct work to bring it back to original condition. Mr. Comeaux explained that the duct work had been disconnected and needed to be reconnected. On March 17, 2000, he estimated the cost to do the work was $500.00. Mr. Comeaux confirmed that the Photographs showed the damages included in his estimate.

Replace value of used equipment used by tenant and either left broken or taken by tenant

Mr. Sigur identified a list of eight pieces of exercise equipment that the Lessor owned that was in the building at the time the Premises were leased to the Lessees. He explained that another health club, which apparently was a former tenant in the building, left the exercise equipment behind as a partial payment. According to Mr. Sigur, the Lessees asked if they could use the Lessor’s exercise equipment; and the Lessor allowed them to do so. When the Lessees moved out, they took all of the equipment that belonged to the Lessor with the exception of two pieces that they left behind in a broken condition. Mr. Sigur explained that he valued the used exercise equipment that was broken *543 and taken by the Lessees at $588.00 using a discounted figure.[9]
| g1In opposing the damage award, Mr. Ditta’s sole evidence was the testimony of Mr. Estopinal and Mr. Bush that the Premises was left broom clean and that the condition of the Premises was not as depicted in the Photographs. Mr. Estopi-nal testified that “[t]here was no broken glass when I was there moving out, no.” He also testified that when he assisted the Lessees in moving out, there was no plaster on the floor, the ceiling tiles were present, the walls were not kicked out, and the bathrooms were in tact. Indeed, he testified that he “used the bathroom before he left and the toilets and all were in the building when he left.” Mr. Bush testified that “we had it cleaned up. They were sweeping and mopping when we left.”
The Lessor presented evidence to support each of the items of special damages that the trial court awarded. The Lessor’s positive evidence — including the Photographs, invoices, estimates, and testimony of its witnesses — was not rebutted by Mr. Ditta. The trial court expressly called into question the credibility of Mr. Ditta’s two witnesses. Moreover, as the Lessor points out, Mr. Ditta presented no evidence that any other third party committed the damages or left the premises in such condition. We thus find no error in the trial court’s finding that Mr. Ditta was liable for the seven categories of damages set forth in the Lessor’s Chart.
As to Mr. Ditta’s contention that the repairs to the Premises may not have been performed by the Lessor thus negating any liability on his part, the trial court correctly rejected this contention. An estimate of the cost of repairs is sufficient to support a judgment; it is unnecessary that the damaged property actually be repaired. Abaunza v. Bowman, 252 So.2d 192, 194 (La.App. 3d Cir.1971) (citing Southern Farm Bureau Cas. Ins. Co. v. Burks, 183 So.2d 88 (La.App. 1st Cir. 1966); Lambert v. Allstate Ins. Co., 195 So.2d 698 (La.App. 1st Cir.1967); Jackson v. Firemen’s Ins. Co., 86 So.2d 220 (La.App. 1st Cir.1956)).
Rejecting a similar argument, this court in Bernard, Co., Inc. v. Factory Outlet Shoes of New Orleans, Inc., 503 So.2d 647, 649-50 (La.App. 4th Cir.1987), stated:
Appellant also claims that the trial court erred by awarding damages to Bernard for remedial work which was not performed and which Bernard had no obligation to perform. Appellant points out that of the total award to Bernard, $45,490.00 represented compensation for damaged items which Bernard had not repaired as of the date of trial. Appellant characterizes the judgment award as “exemplary or punitive damages”.... We disagree.
The testimony and evidence presented at trial clearly establishes that Factory Outlet surrendered the building to the lessor in a state of disrepair. The judgment award represented the estimated cost of repairing maintenance deficiencies rather than an award of exemplary or punitive damages.... Bernard’s failure to repair the deficiencies prior to trial does not waive Factory Outlet’s underlying duty to comply with the terms of the lease nor would it affect the ultimate assessment or award of damages. Factory Outlet was required to maintain and surrender the building in good order. We find no error on the part of the trial court in its award of *544 damages based upon its finding that Factory Outlet failed to comply with the terms of the lease.
Id. By analogy, Mr. Ditta’s contention that his liability for damages to the Premises is somehow negated by the Lessor’s failure to repair the damages is unpersuasive.
Although a lease may provide for the lessor’s recovery of attorneys’ fees, “the recovery is limited to reasonable fees, even if a percentage fee is stipulated in the lease.” 2 Peter S. Title, LA. PRAC. REAL EST. § 18:83 (2d ed.2012) (citing Central Progressive Bank v. Bradley, 502 So.2d 1017 (La.1987); Keever v. Knighten, 532 So.2d 826 (La.App. 4th Cir.1988)). In this case, the governing leases (Lease 2 and Lease 3) included a provision authorizing the award of ten ^percent attorneys’ fees. Based on this provision, the trial court awarded the Lessor $2,119.86 in attorneys’ fees. The record reflects that in 2009 the Lessor’s attorney offered a statement reflecting that from 2000 to 2008 he performed 66.28 hours of work on this case. Subsequently, the Lessors’ attorney had to spend additional hours on the case defending Mr. Ditta’s motions for new trial and motion to dismiss for abandonment and retrying the case. Accordingly, we find the attorneys’ fee award of $2,119.86 was reasonable.
Based on our review of the record, we find no error in the trial court’s award of $23,318.51 in damages to the Lessor.

DECREE

For the forgoing reasons, the judgment of the trial court is affirmed.
AFFIRMED

. The property in question is a two-story building that has four different municipal addresses, 8717 to 8721 West Judge Perez Drive. The leases refer solely to the principal municipal address, 8717 West Judge Perez Drive. The initial two leases covered two of the three portions of the building; the third lease added the third portion of the building to the leased premises.

. As the trial court noted in its reasons for judgment, "[d]efendant, Donald J. Henritzy, *532 Jr., filed a personal bankruptcy petition and was adjudicated as bankrupt, discharging him from this obligation.” The Lessor, in his post-trial memorandum, stated that it was not seeking a judgment against Mr. Henritzy because he had filed for bankruptcy.

. In 2000, the petition was filed by Kenneth M. Sigur and Frederick J. Sigur, Jr., as testamentary co-executors of the Succession of Frederick J. Sigur. In 2004, Kenneth Sigur died. At trial, the Succession was represented by the remaining executor, Frederick Si-gur, Jr. The references in this opinion to Mr. Sigur are to the surviving son and remaining executor.

. This more than three-year period of inactivity in the record of this case is the basis of Mr. Ditta’s claim that the case was abandoned under La. C.C.P. art. 561.

. The invoices state the company name as "Comeaux Mechanical, Inc.”

. La. C.C.P. art. 561 provides as follows:
A. (1) An action is abandoned when the *536 parties fail to take any step in its prosecution or defense in the trial court for a period of three years, ...
(2) This provision shall be operative without formal order, but, on ex parte motion of any party or other interested person by affidavit which provides that no step has been taken for a period of three years in the prosecution or defense of the action, the trial court shall enter a formal order of dismissal as of the date of its abandonment. The order shall be served on the plaintiff pursuant to Article 1313 or 1314, and the plaintiff shall have thirty days from date of service to move to set aside the dismissal. However, the trial court may direct that a contradictory hearing be held prior to dismissal.
B. Any formal discovery as authorized by this Code and served on all parties whether or not filed of record, including the taking of a deposition with or without formal notice, shall be deemed to be a step in the prosecution or defense of an action....

. At trial, the trial court noted that he made an error and that he should not have granted Mr. Ditta's motion to dismiss as abandoned. The trial court thus refused to allow Mr. Ditta to testify regarding the abandonment issue.

. Because these two categories overlap, we address them together.

. Mr. Sigur explained that he used the cost of the equipment from First Lady Spa and applied a fifteen percent figure to discount the equipment as used and arrived at the $588.00 figure.